596 So.2d 256 (1992)
L. Carl PITRE, Plaintiff-Appellant,
v.
GOVERNMENT EMPLOYEES INSURANCE COMPANY, et al., Defendants-Appellees.
No. 90-996.
Court of Appeal of Louisiana, Third Circuit.
March 11, 1992.
Rehearing Denied April 8, 1992.
Writ Denied July 1, 1992.
*257 Rozas, Manueal & McGee, A. Bruce Rozas, Daniel McGee, Mamou, and Kenneth Pitre, Eunice, for plaintiff/appellant.
Dauzat, Falgoust, Caviness & Bienvenu, Jerry L. Falgoust and Jeigh Stipe, Opelousas, for defendant/appellee, State Farm.
Stafford, Stewart & Potter, Bradley J. Gadel, Alexandria, for defendant/appellee, Geico.
Before GUIDRY, J., and MARCANTEL and CULPEPPER, JJ. Pro Tem.
GUIDRY, Judge.
Plaintiff, Lucien Carl Pitre, appeals a jury verdict finding him five percent (5%) at fault in a two vehicle accident and awarding him a gross total of $265,985.29 in damages.
Plaintiff instituted this suit naming as defendants, Ruby Vallot and her liability insurer, Government Employees Insurance Company (GEICO), and his uninsured/underinsured carrier, State Farm Mutual Automobile Insurance Company (State Farm). Following rendition of the trial court's judgment, plaintiff settled with and released Ruby Vallot and her insurer, GEICO, and then prosecuted this appeal against State Farm.[1]
State Farm answered the appeal arguing that the jury's damage award was excessive and the percentage of fault assigned to plaintiff was too low. Further, State Farm seeks judgment against defendant, Ruby Vallot, for any sums it may be required to pay and that plaintiff be cast with all costs of this appeal.

FACTS
For the most part, the facts in this case are undisputed. At approximately 1:10 p.m. on October 8, 1987, plaintiff was proceeding north on Court Street in Ville Platte, Louisiana. As he approached Cotton Street, a four way stop intersection, he *258 slowed and stopped. To his left he saw the Vallot vehicle approximately 100 feet from the intersection approaching the corner. To his right he observed a car about 15 feet from the intersection slowing in preparation to stop. Pitre then proceeded to cross the intersection without again checking on the Vallot vehicle. Before he could reach the center of the intersection, his pick-up truck was struck on the left front by the Vallot vehicle. The Vallot vehicle left 27 feet of skid marks beginning approximately 15 feet before the stop sign on Cotton Street and ending under the Vallot vehicle's right rear tire.
After the accident, Pitre drove himself to Humana Hospital in Ville Platte where he was seen in the emergency room by Dr. J.H. Soileau. Because of plaintiff's complaints of neck and shoulder level back pain, Dr. Soileau ordered cervical and thoracic x-rays. Those x-rays showed "... no fracture, dislocation or subluxation". However, the x-rays did reveal "... a great amount of spurring posteriorly at the C5, C6 level with [a] greatly narrowed posterior aspect of the C5, C6 discs".
On October 12, 1987, Pitre consulted Dr. Henry Dupre still complaining of neck and shoulder level back pain. After three visits with no improvement, Dr. Dupre referred plaintiff to Dr. Frank Anders. Dr. Anders suspected nerve root compression at C5-6 and ordered an MRI scan of plaintiff's neck area. The MRI confirmed a disc herniation at C5-6 and because he did not do cervical disc surgery, Dr. Anders referred Pitre to Dr. J. Robert Rivet.
Dr. Rivet saw plaintiff on January 29, 1988, hospitalized him February 1, 1988 and had a myelogram done to confirm the presence of an abnormal disc at C5-6. A C5-6 fusion was performed on Pitre the next day. Before discharging Pitre from the hospital, Dr. Rivet ordered a consultation with Dr. Norman Anseman, a physiatrist, to aid in Pitre's rehabilitation. Plaintiff's recovery was uneventful and he was discharged by Dr. Anseman on April 7, 1988 and by Dr. Rivet on November 21, 1988.
Pitre started physical therapy in December of 1987 and he was encouraged to continue so long as he felt it was beneficial.
On September 29, 1988, plaintiff returned to see Dr. Anseman complaining of occasional flare ups of his former symptoms. He was given some muscle relaxants and encouraged to have additional physical therapy. By November 21, 1988 his symptoms had increased to approximately the same level as before surgery. Accordingly, Dr. Anseman ordered an MRI scan and referred Pitre back to Dr. Rivet. The MRI scan was read by the radiologist as normal, but Dr. Rivet disagreed and ordered a cervical myelogram which he interpreted as showing an abnormal disc at C6-7.
A second cervical fusion was performed on Pitre on May 20, 1989. Both Drs. Anseman and Rivet evaluated plaintiff after this surgery and followed his recovery. Plaintiff was discharged by Dr. Anseman on June 20, 1989 and by Dr. Rivet on November 13, 1989. Plaintiff continued his physical therapy into December 1989.
Neither doctor felt that plaintiff would need any additional surgery and neither had plans to treat Pitre any further, feeling that he had reached maximum medical cure. They both agreed that plaintiff would have to limit his physical activities but initially disagreed as to these limitations. In deposition, Dr. Rivet stated that he would defer to Dr. Anseman on the question of limitations. Dr. Anseman stated that he would restrict Pitre from any activity which would put vibrational stress on his neck, i.e., hunting with a high powered rifle or driving a truck for a living. He had no objection to Pitre returning to work in a supervisory capacity so long as he did not attempt to lift more than 45 pounds; did not engage in prolonged flexion or extension of his neck; did not push or pull more than approximately 20 pounds; and, did no climbing or crawling.
At the time of the accident, Pitre was self-employed, being the sole proprietor of Pitre Steel Buildings, Inc., a subchapter "S" corporation. According to plaintiff and several other witnesses, Pitre believed *259 in the hands on school of business management, that is, he worked along side of his employees during the erection of a building.
Testimony was also elicited at trial establishing that Pitre was a "blue top" heavy equipment operator. According to this evidence, plaintiff was one of only a few heavy equipment operators able to grade a road bed to within approximately one inch of the surveyors' survey line. It was further established that, because of his vast experience and knowledge of various types of equipment, Pitre was well qualified for a supervisory position.
Dr. John W. Grimes, an expert in vocational rehabilitation, testified that given plaintiff's age, education, training, aptitude and restrictions, he is definitely presently employable at the $4.50 per hour range, and with some vocational training would be employable in the $5.00 to $7.50 per hour rangemost likely between $6.00 and $6.50 per hour.
Pitre's income tax returns from 1983 through 1988 (the trial took place in February 1990) were introduced. His 1983 return showed an adjusted gross income of $29,000 of which $18,000 were wages. He earned $18,900 in wages in 1984 and showed a net loss of $4,477 for 1985. Plaintiff showed no wage earnings in 1986 or 1987 but $10,052 and $5,800 income through his business for the respective years. His 1988 return showed adjusted gross income of $3,736$2,062 in wages and $1,674 through his business.
Aside from Pitre's claims, there was also a loss of consortium claim for plaintiff's son, Lucien Carl Pitre, Jr., who was 15 years old on the date of the trial. At the time plaintiff was injured, he and his wife had been separated for a number of years and were in the process of obtaining a divorce. Carl, Jr. lived with his mother and Carl, Sr. had visitation rights on every other weekend. After plaintiff's first fusion, Carl, Jr. moved in with his father "to help out". Carl, Jr. testified that, although he and his father can no longer do such things as ride three wheelers, deer hunt, work in the shop or play ball together, he actually has become closer to his father and has seen more of him since the accident.
After a five day trial, the jury found for plaintiff, making the following awards:

1. Past and future medical expenses $ 41,185.29
2. Loss of earning capacity (Past) $ 10,000.00
3. Loss of earning capacity (Future) $180,800.00
4. Loss of enjoyment of life (Past and Future) $ 0
5. Physical pain and suffering (Past and Future) $ 34,000.00
6. Mental anguish & emotional distress (Past and Future) $ 0
 TOTAL $265,985.29
 L. CARL PITRE, JR.
Loss of Consortium................................ $ 0

Additionally, they found plaintiff to have been 5% contributorily negligent. Both plaintiff and defendants filed motions for JNOV or additur and remittur respectively. After all motions were denied, this appeal followed.
On appeal, plaintiff argues that the jury erred in the following respects: (1) assessing any fault to plaintiff in causing the accident; (2) not awarding plaintiff any damages for either loss of enjoyment of life or mental anguish; (3) in awarding plaintiff only $34,000 for pain and suffering; and, (4) in not making any award to Carl, Jr. for loss of consortium.
Defendant, State Farm, answered the appeal arguing that the overall damage award to plaintiff was excessive; the percentage *260 of fault assessed to plaintiff should be increased; and, in the event State Farm is required to pay any sum of money to plaintiff, that judgment be rendered in favor of State Farm and against Ruby Vallot for such sum.

JURY'S ASSESSMENT OF FAULT
The jury found plaintiff to be 5% at fault in causing the accident. Our careful review of the record in this case reveals no clear or manifest error in this conclusion.
Plaintiff came to a complete stop at the four way stop intersection. At such time his vehicle was the only vehicle at the intersection. After observing the approach of vehicles from two directions, considering the distance of one and the actions of the other as each approached the intersection, plaintiff proceeded into the intersection. It is well settled that a motorist has the right to assume that the driver of a vehicle approaching an intersection controlled by a stop sign will obey the law. He may indulge in this assumption until he knows or has reason to know that the approaching motorist will violate his right of way. Presumably, the jury concluded that plaintiff should be assessed with 5% fault because of his failure to again check on the approach of the Vallot vehicle before entering the intersection. We are unable to state that this very minimal finding of fault constitutes clear error.

THE LOSS OF CONSORTIUM CLAIM
The record reflects that plaintiff and his son saw each other regularly approximately every other weekend before Carl, Sr.'s accident. After Carl, Sr.'s surgery, Carl, Jr. moved in with his father and lived there for in excess of a year in order to help his father. While they can no longer engage in physically strenuous activities together, the record reflects they do enjoy watching sporting events together and other non-physically demanding activities. At trial, Carl, Jr. testified that, since Carl, Sr.'s surgeries, he and his father had become closer and see more of each other. Accordingly, we cannot say that the jury abused its much discretion in denying Carl, Jr.'s claim for loss of consortium.

THE DAMAGE AWARD TO PLAINTIFF
In reviewing the other elements of damages awarded, we are guided by the following:
"The standard of review for quantum was enunciated by the Supreme Court in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), wherein it stated (at 334):
"We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. (citations omitted) Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court."
The Supreme Court further articulated the process for evaluating quantum in Reck v. Stevens, 373 So.2d 498, 501 (La. 1979) wherein it stated that:
"... the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's `much discretion,' La. Civ.C. Art. 1934(3), in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive... or insufficient. (emphasis added)"
Ferro v. Green, 394 So.2d 824, 828 (La. App. 4th Cir.1981). We have reviewed the damage award in this case with the foregoing principle in mind. We further conclude that, in applying those principles, although the awards for certain elements of damages may be inadequate or excessive if the total sum awarded is neither excessive *261 or inadequate it must not be disturbed. See Ferro, supra, and Ritchey v. Dees, 540 So.2d 1265 (La.App. 3rd Cir.), writ denied, 542 So.2d 1387 (La.1989).
The record reflects that Pitre actually incurred $32,185.29 in past medical expenses. He proved no future medical expenses, hence, the jury award for medical expenses was excessive.
Based upon Pitre's tax records introduced into evidence, his work life expectancy and his ability to re-enter the work force, albeit in a limited capacity, we conclude that the amount awarded for loss of future earnings is grossly excessive. On the other hand, no award was made for either loss of enjoyment of life or mental anguish, and the award for pain and suffering is, in our view, low. However, we determine that the total damage award, in the sum of $265,985.29, is neither clearly excessive nor clearly inadequate. Accordingly, it will not be disturbed.
For the reasons stated, the judgment of the trial court is affirmed. Plaintiff-appellant is cast with all costs of this appeal.
AFFIRMED.
NOTES
[1] The record reflects that GEICO provided Vallot with liability coverage of $300,000.00.